In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1079

GREGORY KEMP,

*Plaintiff-Appellant,*

*v.*

FULTON COUNTY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 17-cv-1404-JBM — **Joe Billy McDade**, *Judge.*

ARGUED SEPTEMBER 23, 2021 — DECIDED FEBRUARY 25, 2022

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge*. While Gregory Kemp was confined at the Fulton County Jail awaiting his trial, he became involved in a melee with three other detainees. Kemp cried out for help, but no one heard him or came to his aid until the beating was over. He suffered serious injuries from the incident.

Believing that the Jail's failure to protect him from the attack violated his rights under the Fourteenth Amendment to the U.S. Constitution, Kemp brought this action under 42 U.S.C. § 1983 against Fulton County Sheriff Jeff Standard, Sergeant Christopher Ford, and Officer Sheldon Burget. After discovery, the district court granted defendants' motion for summary judgment. We affirm.

**I**

**A**

Because the case was resolved on summary judgment, we view the facts in the light most favorable to Kemp, the non-moving party. See *Dixon v. Cnty. of Cook*, 819 F.3d 343, 346 (7th Cir. 2016). The account that follows reflects this perspective.

As of September 5, 2016, Kemp and three others—Bradley Dearborn, Edwin Galvez, and Luis Lind-Enriquez—were all pretrial detainees at the Jail. They were housed in Cell Block G, where they had lived together without incident for several months. That streak of good behavior came to an end when Kemp had an argument with Galvez. The altercation led Dearborn to threaten to "get [Kemp]." Shortly after Dearborn issued this threat, defendant Sheldon Burget, a correctional officer on duty during the incident, made his rounds through the common area. Kemp considered telling Burget about Dearborn's statement, but he chose not to do so, in order to avoid being seen as a "snitch." Instead, Kemp made the unfortunate decision to confront Galvez and Dearborn violently. Kemp threw the first punch, and Dearborn and Galvez responded by beating him.

Jail surveillance video shows that Lind-Enriquez soon joined in the beating; after a few hits, he went to his cell to get

a sock stuffed with a hard "paintball," made (as the name suggests) from dried paint. Back in the melee, Lind-Enriquez began striking Kemp with the makeshift weapon. Lind-Enriquez can be seen on the video throwing a toilet plunger at Kemp, though he missed. Kemp yelled for help, but neither Burget nor anyone else responded.

That beating lasted only a few minutes. Afterwards, the video shows Kemp cleaning the common area with soap and bleach while Lind-Enriquez washed blood off of his body. Kemp testified that the others told him they'd "all be cool." But about 20 minutes later, tensions flared again, Lind-Enriquez attacked Kemp a second time, and Dearborn and Galvez joined in. The second fight ended with Kemp lying motionless on the floor. Another correctional officer, Tiffany Williams, who was conducting her assigned rounds, stopped at the common area a few minutes after the second beating ended. Williams saw Kemp lying on the floor and called for emergency medical services. The medics responded about eight minutes later; they moved Kemp onto a stretcher and later sent him to the hospital.

As we said, Burget was patrolling the Jail as all this was unfolding. But, as he admitted during his deposition, he had about 60% hearing loss in one ear and about 40% hearing loss in the other. His physician had prescribed a hearing aid for one ear, but Burget stopped wearing it about six months before the September 5 incident and thus was not using it at the time of the fight.

Kemp speculates that if Burget had been wearing his hearing aid on the day of the attack, he would have heard Kemp's cries for help. But the record contains no evidence that would permit such a finding. Nothing indicates that Burget's hearing

loss was severe enough to prevent him from hearing the commotion, or more generally from performing his job. Both parties agree that Burget frequently did hear fights, loud noises, and yelling while in the Jail. Kemp even testified that Burget had responded to his calls in the past. Similarly, the record lacks any evidence showing how much Burget's hearing aid improved his hearing, if at all.

Kemp, pointing to the Jail's logs showing the rounds covered by each guard, asserts that Burget was standing in a nearby hallway where someone with better hearing would have heard the sounds of a fight. But Burget's location during the beating was contested. Defendants admit that sound carries through the Jail, but they also offered evidence that the Jail was often noisy, making it difficult for guards to overhear what was happening in other parts of the building. At least three other Jail employees (correctional officer Williams and dispatchers Tanisha Bradford and Keith Wojtkiewicz) were also near the site of the brawl. Bradford and Wojtkiewicz (neither of whose auditory ability was challenged) deny hearing any telltale noise. Williams testified that she heard sounds of a fight only as she walked toward the Jail's G Block during her rounds. She described hearing the sound of "two people wrestling" and "stomping," but she denied hearing cries for help.

Neither Sheriff Standard nor Sergeant Ford was on the premises during the September 5 beating. Kemp contends, however, that they are personally responsible for what happened because they each knowingly allowed Burget to work as a corrections officer despite his diminished hearing. Standard and Ford deny knowing that Burget had a hearing impairment (or at least one that mattered). Kemp sees a disputed

material fact on this point; he argues that Standard and Ford must have known about Burget's hearing problem because Burget previously had worked in the Jail as a dispatcher in 2007 or 2008. Burget was dismissed from that job because of "problems with [his] hearing." Sheriff Standard was aware of this when he later hired Burget. (The defendants assert that Burget was actually fired from the dispatcher position because of general incompetence, but we must credit the version that favors Kemp.)

## B

Kemp filed this action against Standard, Ford, and Burget. His complaint also named Williams as a defendant, but he has abandoned his claims against her on appeal. He also joined Fulton County as a necessary party for payment of any settlement or judgment. See 745 ILCS § 10/9-102.

As we noted earlier, the district court entered judgment for the defendants. Kemp could not prevail against Burget, the court concluded, because nothing in the record would have put a reasonable guard on notice of a substantial risk of harm to Kemp. With respect to Standard and Ford, the court concluded that Kemp had failed to point to any evidence that would support a finding that they were aware of the degree of Burget's hearing loss or that Burget's hearing loss was causally linked to Kemp's injury. Kemp has appealed the judgments in favor of all three defendants.

## II

We consider the correctness of a district court's grant of summary judgment independently, without any thumb on the scale in favor of the district court's assessment. *Dixon*, 819 F.3d at 346. Summary judgment is proper against a party who,

after sufficient time for discovery, fails to show how a fact-finder could find in his favor on an essential element on which the party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

We begin with Kemp's failure-to-protect claim against Burget, and then turn to the supervisory defendants. Incarcerated people have a clearly established right to be free from physical harm inflicted by others in the institution. See, *e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[P]rison officials have a duty … to protect prisoners from violence at the hands of other prisoners."); *Rice ex rel. Rice v. Corr. Med. Serv.*, 675 F.3d 650, 668 (7th Cir. 2012) ("Jail officials have a duty to protect inmates from violent assaults by other inmates."). Correctional officials who are deliberately indifferent to inhumane conditions of confinement, including violence behind bars, may be held liable under 42 U.S.C. § 1983. See *Rice*, 675 F.3d at 665, 669; *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007).

## A

Because Kemp was a pretrial detainee, his conditions-of-confinement claim arises under the Due Process Clause of the Fourteenth Amendment, which is governed by an objective standard. *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019). In contrast, those who are serving prison sentences after a trial must rely on the Eighth Amendment's bar on cruel and unusual punishment, which requires a showing of both an objectively unreasonable deprivation of rights and subjective deliberate indifference. The difference in standards stems from the fact that pretrial detainees remain entitled to the presumption of innocence, and so the Constitution protects them from

any *punishment* for the acts that led to their detention. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018).

The Supreme Court underscored the importance of the distinction between convicted inmates and those who are detained pending adjudication of their cases in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). There it held that a pretrial detainee bringing an excessive-force claim under the Fourteenth Amendment need not satisfy the Eighth Amendment's subjective-intent standard.

While *Kingsley* was specifically about excessive-force claims, we have recognized that "[n]either the Supreme Court's logic nor its language" is limited to that context. *Hardeman*, 933 F.3d at 823. Recognizing the Supreme Court's "signal[] that courts must pay careful attention to the different status of pretrial detainees" as compared with convicted offenders, we have applied *Kingsley*'s objective unreasonableness test to other Fourteenth Amendment claims, including challenges to inadequate medical care and other conditions of pretrial confinement. *Hardeman*, 933 F.3d at 822–23; *Miranda*, 900 F.3d at 352. Other circuits, including the Second, Sixth, Ninth, and Tenth, have similarly concluded that *Kingsley*'s objective standard applies to some or all conditions-of-confinement cases brought by pretrial detainees. See *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) (medical need); *Colbruno v. Kessler*, 928 F.3d 1155, 1161–63 (10th Cir. 2019) (general conditions of confinement); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (medical need); *Darnell v. Pineiro*, 849 F.3d 14, 34–35 (2d Cir. 2017) (general conditions of confinement). But see *Strain v. Regalado*, 977 F.3d 894 (10th Cir. 2020) (holding that *Kingsley* is limited to excessive-force cases

and applying both a subjective and objective standard to medical-care cases).

Following *Kingsley*, *Miranda*, and *Hardeman*, a plaintiff such as Kemp challenging the conditions of his pretrial detention need show only that a defendant's conduct was "objectively unreasonable." *Hardeman*, 933 F.3d at 824. Burget thus would be liable if he "acted purposefully, knowingly, or perhaps even recklessly" in coming to work without his hearing aid, but not if he were no more than negligent. *Miranda*, 900 F.3d at 353; see also *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986) (a state official's "mere lack of due care" does not "'deprive' an individual of life, liberty, or property under the Fourteenth Amendment."). Objective reasonableness "turns on the facts and circumstances of each particular case." *Kingsley*, 586 U.S. at 397.

We have not yet had the occasion to consider how *Kingsley*, *Miranda*, and *Hardeman* apply to a failure-to-protect claim. Our pre-*Kingsley* cases follow the Eighth Amendment's approach (*i.e.*, objective harm plus subjective intent) to pretrial settings. See, *e.g.*, *Rice*, 675 F.3d at 669; *Guzman*, 495 F.3d at 857; *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002). But, just as we have done with medical-care and excessive-force cases, we must now take *Kingsley* into account.

We begin by recalling that in *Kingsley*, the Supreme Court explained that an excessive-force claim raises two distinct state-of-mind issues:

The first concerns the defendant's state of mind with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns

the defendant's state of mind with respect to whether his use of force was "excessive." … We conclude with respect to that question that the relevant standard is objective not subjective.

*Kingsley*, 576 U.S. at 395. In *Kingsley* itself, there was no dispute over the first question: both parties agreed that the defendant officers had intentionally stung Kingsley with a Taser. But on the second question—whether that degree of force was excessive—the Court stated that "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id*. It summarized its holding as follows: "a pretrial detainee must show only that [1] force purposely or knowingly used against him [2] was objectively unreasonable." *Id*. at 396–97. For example, "if an officer's Taser goes off by accident," a pretrial detainee could not prevail, because she could not show that the officer knowingly used force. *Id.* at 396. But a pretrial detainee does not need to show that an officer who intentionally tased her also understood that the use of the Taser was excessive or that the officer otherwise intended harm or pain. The detainee need only demonstrate that a reasonable person would recognize that the use of force was objectively unreasonable under the circumstances. *Id*. at 396–97.

The Ninth Circuit, sitting *en banc*, applied these principles to failure-to-protect claims in *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (7th Cir. 2016) (*en banc*). It held there that a pretrial detainee does not need to show that an officer with all the information about a potential health or safety risk actually did put the puzzle pieces together. In doing so, it contrasted the test in Fourteenth Amendment cases with the Eighth Amendment's requirement to show subjective deliberate indifference. *Id.* at 1068. At the same time, as we have done, it

acknowledged that "negligent conduct does not offend the Due Process Clause." *Miranda*, 900 F.3d at 353 (citing *Daniels*, 474 U.S. at 330–31); see *Castro*, 844 F.3d at 1071. The Ninth Circuit reasoned that a pretrial detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Castro*, 833 F.3d at 1071. It held that:

> [T]he elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:
>
> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, *even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved*—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* (emphasis added). The third of these elements is the critical one for our purposes. Put more succinctly, it requires only that the defendant's conduct be objectively unreasonable.

Like the Ninth Circuit, and following our own post-*Kingsley* line of cases, we now hold that *Kingsley* abrogates *Guzman*, *Butera*, and their kin to the extent that they require pretrial detainees to show, in a failure-to-protect case, that a defendant was subjectively "aware of a substantial risk of serious

injury." *Guzman*, 495 F.3d at 857 (citing *Butera*, 285 F.3d at 605). This requirement cannot be reconciled with *Kingsley*'s language, reasoning, and reminder to "pay careful attention to the different status of pretrial detainees." *Miranda*, 900 F.3d at 352. We hold, as the Ninth Circuit did in *Castro*, that the defendant officer must intend to carry out a certain course of actions; negligence is not enough. At that point, the remaining question is whether that course is objectively reasonable. If not, there is a Fourteenth Amendment violation.

B

Kemp urges that he can meet this standard with respect to Burget, because Burget intentionally chose not to wear his hearing aid on the day of the fight. We agree with him in part: the facts he presented at summary judgment, if believed, show that he satisfies the first point. But more is needed to show that a trial is necessary. The remaining questions are whether that decision put Kemp at substantial risk of serious harm; whether a reasonable officer in Burget's shoes would have appreciated the risk that his actions entailed; and whether Burget's failure to wear his hearing aid caused Kemp's injuries.

Our own review of this thin record convinces us that Kemp has not presented enough evidence to permit a trier of fact to rule for him on these latter elements. Most importantly, he has not pointed to evidence showing that Burget's hearing impairment and decision not to wear a hearing aid caused Kemp's injuries. Nothing in the record indicates that Burget's hearing was so poor that he could not adequately perform his job. To the contrary, Burget had done his job without his hearing aid for six months. If there was evidence that his performance was wanting during that period, it did not make it into

this record. The record is also devoid of evidence that demonstrates that a person with unimpaired hearing would have been alerted to the first fight by the noise it generated. Dispatchers Bradford and Wojtkiewicz denied hearing the beating, and Officer Williams testified that she heard the second fight only as she got very close to Block G. Their testimony favors the County defendants' position. Finally, no evidence demonstrates how much Kemp's hearing aid improved his hearing or why he stopped wearing it when he did. His testimony that it was ineffective went unrebutted.

The defendants also argue persuasively that Kemp did not present any evidence showing that any of them was on notice of a serious risk of harm to him. Kemp admitted that he never reported his verbal disagreement with Galvez, Dearborn, and Lind-Enriquez or the ensuing threats to Jail employees, and that prior to the beating, all four men had cohabited peacefully for months. Without any evidence that Burget should have been on notice of a substantial risk to Kemp's safety, or that his decision not to wear a hearing aid led to Kemp's injuries, a jury could not conclude that Burget's actions were objectively unreasonable.

### III

### A

Kemp also sued Standard and Ford in their individual capacities. Because the Supreme Court has foreclosed *respondeat superior* liability for section 1983 actions, a plaintiff may hold a government official "liable [only] for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). To be personally liable, a supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear

of what they might see." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). Kemp argues that Standard and Ford knowingly hired and retained a hearing-impaired correctional officer. Although Standard and Ford deny knowing about Burget's hearing loss, we assume, favorably to Kemp, that they knew about it.

*Kingsley*'s objective-unreasonableness test applies equally to supervisory-liability claims. That is because the state of mind necessary to trigger a supervisor's liability varies with the constitutional provision at the heart of the claim, in much the same way that the state of mind needed to establish a section 1983 violation does. See *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 318 (3d Cir. 2014), *cert.* granted, judgment rev'd on other grounds, *Taylor v. Barkes*, 575 U.S. 822 (2015); see also *Locke v. Haessig*, 788 F.3d 662 (7th Cir. 2015); *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (holding that section 1983 plaintiffs may hold supervisors liable by showing that they "acted with the state of mind required to establish the alleged constitutional deprivation."). Thus, applying *Kingsley*'s objective-unreasonableness test, Kemp can defeat summary judgment only if the facts viewed in the light most favorable to him show that Standard and Ford acted purposefully, knowingly, or with reckless disregard for the consequences of hiring and retaining Burget despite his hearing disability. See *Miranda*, 900 F.3d at 353. Once again, he must show more than negligence. *Id*.

B

Standard and Ford argue that Kemp's wrongful hiring and retention arguments are waived because he did not spell them out in his complaint. This is incorrect. "[C]omplaints need not plead legal theories," *Miranda*, 900 F.3d at 345 (7th

Cir. 2018), and Kemp did raise these arguments before the district court. His supervisory-liability theory is thus properly before us. Nonetheless, he cannot prevail for two reasons.

The first is the same causation problem that dooms his claim against Burget: there is no evidence in the record that would allow a reasonable jury to conclude that another officer with no hearing impairment would have heard the fight and intervened earlier. Second, Kemp has presented no evidence that Standard and Ford knew that Burget was not wearing his hearing aid or that they had any reason to believe that he was unable to perform his job duties without the device. Without notice that Burget was posing a danger to the people detailed in the Fulton County Jail, his supervisors' decision to retain him may have been negligent, but there is no evidence that it was purposeful, knowing, or reckless. See *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) ("[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under section 1983.").

## IV

On this record, Kemp has not presented sufficient evidence for a reasonable jury to conclude that defendants Burget, Standard, or Ford took objectively unreasonable actions that caused his injuries. We therefore AFFIRM the district court's grant of summary judgment to all defendants.