In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-3230

MINOSA ECHOLS,

*Plaintiff-Appellant,*

*v.*

TERESA JOHNSON, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:20-cv-04054-SEM-KLM — **Sue E. Myerscough**, *Judge.*

———————————

ARGUED NOVEMBER 29, 2023 — DECIDED JUNE 27, 2024

———————————

Before RIPPLE, SCUDDER, and JACKSON-AKIWUMI, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Minosa Echols, a civil detainee in an Illinois facility, suffered serious injuries when a fellow resident attacked him in a dayroom. Echols sued under 42 U.S.C. § 1983, alleging that three security officers present during the assault violated his rights under the Fourteenth Amendment's Due Process Clause by failing to protect him from the other resident. The case proceeded to trial, and the jury

returned a defense verdict. Echols appeals, relying on our recent decision in *Kemp v. Fulton County*, 27 F.4th 491 (7th Cir. 2022), and contending that the district court committed a legal error by instructing the jury that success on a failure-to-protect claim required a showing that the officer in question was subjectively aware that the other resident presented a risk of harm to Echols.

We agree that the jury instruction was erroneous—in particular, that Echols did not need to prove subjective awareness of the risk of harm to establish liability. On the point most contested by the parties, the jury should have been instructed to answer whether a reasonable officer in the defendant's shoes would have appreciated that the conditions within the dayroom put Echols at risk of harm, and, from there, whether the defendant acted in an objectively unreasonable way in addressing that risk. But to prevail on appeal Echols must also show that the error prejudiced him. And it is on that front that his claim fails. What happened here was so unexpected that no reasonable officer, in the circumstances before them, would have anticipated the surprise attack or taken different measures to protect Echols. In the end, then, we affirm.

## I

### A

On September 16, 2019, Minosa Echols, a civil detainee at the Illinois Department of Human Services' Treatment and Detention Facility in Rushville, met his soon-to-be roommate, Paul Rexroat, in a hallway. The two immediately started bickering. For his part, Rexroat made clear he did not want a roommate and instead strongly preferred to continue living alone, in part because, as he put it, he "liked to be naked in

his room." Echols did not react well to Rexroat's statements and responded with a threat. Rexroat reported the threat to Officer Steven Brown, who documented the "tension" between the two men while also observing that he thought they would find a way to work things out. Officer Brown later testified that it was common for residents not to want to move or acquire new roommates.

Officer Brown did not share any information about Echols's threat, including its occurrence, with the defendants in this case: Officers Teresa Johnson, Scott Wallace, and Richard Logan. Rexroat, however, spoke with Officers Johnson and Wallace the following morning—September 17, the day of the incident. But those officers testified that they did not recall Rexroat relaying any concerns about Echols. All Officer Wallace remembered was that Rexroat did not seem angry the morning of the incident.

Echols arrived at his new room at approximately 8:30 a.m. on September 17. Upon looking inside, he saw someone else's personal items on his bunk. So Echols turned to Rexroat, who was sitting at a dayroom table just outside his room, and told him to remove the items. When Rexroat refused, Echols pressed a call button on the wall to request assistance from the security staff.

Three security officers then walked into the dayroom: defendants Johnson, Logan, and Wallace. Officer Johnson directed Rexroat to move the items off Echols's bed. After refusing to get up from the dayroom table for several minutes, Rexroat finally stood up and walked toward his room, passing Echols (without incident), only then to refuse to take his personal items off the top bunk.

Around this time the officers directed the other detainees in the dayroom to return to their rooms for safety reasons. Officer Johnson then left the dayroom to seek guidance from the shift commander, who directed that Echols and Rexroat both be taken to the disciplinary unit. While waiting for Officer Johnson to return to the dayroom, Echols and Rexroat continued bickering, with Echols at one point asking Rexroat, "What are you going to do, toughy?" At no point, though, did either man threaten the other or make any aggressive move toward the other.

Officer Logan sought to end the arguing by instructing Echols to move to a table about 15–20 feet away from Rexroat. Echols did so without hesitation, with Officers Wallace and Logan then standing near Rexroat on the other side of the dayroom. All of this occurred as the officers awaited direction on a next step from Officer Johnson.

When Officer Johnson reappeared to escort the two men to the disciplinary unit, she directed Echols to stand up for handcuffing. Echols complied. Officer Wallace likewise sought to place handcuffs on Rexroat, who reacted by asking if he could first take some personal items to his room. Officer Wallace agreed because allowing residents to return their belongings to their rooms was "standard procedure." Based on video footage of the incident, Rexroat at that point appeared to be calm.

What happened next forms the basis for the issue on appeal. As Rexroat stood up from the dayroom table, he reached down, removed an object from underneath the table, ran across the dayroom toward Echols, and struck him in the face with the object. Officers Wallace and Logan reacted by immediately running after Rexroat and tackling him to the ground.

Officer Johnson testified that, although she was in the process of handcuffing Echols at the time of the attack, she never saw Rexroat coming. The attack left Echols with serious injuries to his upper lip and teeth. The object Rexroat used to inflict these injuries turned out to be, of all things, a laundry bag stuffed with cafeteria trays.

This lawsuit then followed, with Echols alleging that Officers Johnson, Logan, and Wallace failed to protect him from the clear risk presented Paul Rexroat, a much larger man weighing well over 200 pounds. In time the case proceeded to trial.

B

At the final pretrial conference, the district court sought the parties' input on a proposed four-part jury instruction on the elements of the failure-to-protect claim. Echols objected to the second part of the instruction, which required him to prove that the defendant "was aware of [the] strong likelihood that Plaintiff would be seriously harmed as a result of an assault." Relying on the Supreme Court's 2015 decision in *Kingsley v. Hendrickson*, 576 U.S. 389, and our 2022 decision in *Kemp. v. Fulton County*, 27 F.4th 491, Echols argued that the proposed instruction improperly introduced a subjective component into what should be an objective inquiry into the reasonableness of each officer's actions in responding (or failing to respond) to the risk posed by Paul Rexroat.

The district court overruled Echols's objection and, at defense counsel's urging, instructed the jury as follows on the elements of the failure-to-protect claim:

> 1.  There was a strong likelihood that Mr. Echols would be seriously harmed as the result

of an assault. A mere possibility is not a strong likelihood.

2. The defendant under consideration was aware of this strong likelihood that Plaintiff would be seriously harmed as the result of an assault.

3. The actions or inaction of the defendant under consideration to prevent the assault were objectively unreasonable. In deciding this, you may consider how serious the potential harm to Plaintiff was, how difficult it would have been for the defendant under consideration to take corrective action, and whether the defendant under consideration had legitimate reasons related to safety and security for failing to take corrective action.

4. Plaintiff would not have been harmed if the defendant under consideration had taken reasonable measures.

This instruction came word-for-word from Seventh Circuit Civil Pattern Jury Instruction 7.16, which has not been updated to reflect or account for the Supreme Court's decision in *Kingsley* or our decisions in *Kemp* or *Thomas v. Dart*, 39 F.4th 835 (7th Cir. 2022).

Trial lasted three days. In addition to hearing the testimony from the three defendant security officers and watching surveillance footage of the attack, the jury saw video of Rexroat sneaking around the dayroom on the morning of the incident. Unbeknownst to Officers Johnson, Wallace, and Logan, he made two separate trips to his room, each time

carrying a plastic breakfast tray. Once inside his room, Rexroat then placed the trays inside a laundry bag, tied the bag closed, and placed it behind the toilet. Later, after checking to make sure that no one was watching, Rexroat moved the bag into the dayroom and hid it under the table outside his room.

After deliberating for an hour, the jury returned a verdict in favor of all three defendants. Echols now appeals.

## II

### A

We begin with Echols's challenge to the jury instructions, focusing on whether the district court's articulation of the elements of the failure-to-protect claim accurately captured the relevant legal principles. See *Clarett v. Roberts*, 657 F.3d 664, 673 (7th Cir. 2011). We afford district courts "substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law." *United States v. Gibson*, 530 F.3d 606, 609 (7th Cir. 2008) (internal quotation marks omitted). Even if the instruction contains a legal error, we will reverse only if the error prejudiced Echols. See *Cotts v. Osafo*, 692 F.3d 564, 567 (7th Cir. 2012).

Echols is right that the district court's instruction misstated the law. The beginning point is recognizing that the Constitution confers a right on anyone incarcerated to be free from physical harm inflicted by others in the institution. For persons convicted of a crime and serving a sentence, the right comes from the Eighth Amendment's prohibition on cruel and unusual punishment. See *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). But for persons not convicted of a crime,

including pretrial detainees and those like Echols who are in the civil custody of a state, the right to protection comes from the Fourteenth Amendment's Due Process Clause. See *Kemp*, 27 F.4th at 495 (explaining the rationale in meaningful detail); see also *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982) (holding that civil detainees, like pretrial detainees, have a protected liberty interest under the Fourteenth Amendment to reasonably safe conditions of confinement).

The source of the right matters. "[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody." *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)).

Federal courts disagreed for years as to the standard for judging pretrial detainees' claims under the Fourteenth Amendment. The Supreme Court granted review in *Kingsley v. Hendrickson* to resolve the issue in the excessive-force context, clarifying that a pretrial detainee need show only that the force used was objectively unreasonable. See 576 U.S. at 395–97. In so holding, the Court found legal error with a jury instruction that required proof of "reckless disregard of [the plaintiff's] rights" and a showing that the defendants "reasonably believed there was a threat to the safety of staff or prisoners." *Id.* at 403. Put another way, the Court disapproved of a jury instruction that required the jury to "weigh [a correctional officer's] subjective reasons for using force and subjective views about the excessiveness of the force." *Id.* at 403-04.

In *Kingsley*'s wake, we decided two cases in 2022 that provide substantial direction for resolving this appeal. First came *Kemp v. Fulton County*, where we expressly extended the objective reasonableness inquiry for pretrial detainees to the

failure-to-protect context. See 27 F.4th at 495. Relying at every turn on *Kingsley*, we explained that a defendant officer need not have subjectively perceived the risk of harm particular actions or conditions of confinement presented to a plaintiff detainee. See *id.* at 497. A subjective risk of harm requirement, we underscored, "cannot be reconciled with *Kingsley*'s language, reasoning, and reminder to pay careful attention to the different status of pretrial detainees." *Id.* (internal quotation marks omitted).

Next came *Thomas v. Dart*, where we expanded on our reasoning in *Kemp* by articulating in these terms the elements of a due process-based failure-to-protect claim:

> (1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries.

39 F.4th at 841.

As *Thomas* makes clear, a pretrial or civil detainee pressing a failure-to-protect claim must have been placed at or exposed to a substantial risk of suffering serious harm with the defendant then acting in an objectively unreasonable way in response to that risk of harm.

B

That brings us to the instruction the district court provided to the jury on the elements of Echols's failure-to-protect claim. The legal error in the jury instruction came with the second element, which required Echols to prove that "[t]he defendant under consideration was aware of th[e] strong likelihood that Plaintiff would be seriously harmed as the result of an assault." By its terms—and as both parties agree—this instruction required Echols to prove that the defendant in question was aware of the strong likelihood that Rexroat would assault Echols in the dayroom.

That requirement conflicts with the direction from *Kingsley*, *Kemp*, and *Thomas* because it impermissibly introduced a subjective state-of-mind component into what should have been an objective reasonableness inquiry. The jury instead should have been instructed to assess whether a reasonable officer, situated within the dayroom as the defendant at issue was situated before the attack, acted in an objectively reasonable way in taking or failing to take action to mitigate the risk of harm that Paul Rexroat presented to Minosa Echols.

**III**

Echols must go beyond identifying error in the district court's jury instruction. He needs to show that the error prejudiced him at trial. See *Cotts*, 692 F.3d at 567. This is true even for "patently incorrect" instructions. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000). "[I]n cases where the erroneous jury instruction caused a party to bear a heavier burden, we have held that no prejudice occurred when the evidence was so weak that it would have failed under either burden." *Brooks v. City of Kankakee, Illinois*, 7 F.4th 649, 664 (7th

Cir. 2021). Stated another way, Echols needs to show that the evidence presented at trial permitted a finding of objective unreasonableness on the part of at least one named defendant.

He has not done so. After reviewing video footage of the incident—the entirety of the attack was caught on camera—we are left with two reactions. *First*, from our vantage point, it seemed most unpredictable that Rexroat, a man with no indication of being swift on his feet, would attack Echols when and in the way he did—by running across the dayroom when it appeared that both men were cooperating with steps underway to take them to the disciplinary unit. *Second*, the video shows that the officers acted to seize Rexroat and protect Echols as soon as the danger manifested itself.

We reach the same conclusion upon taking a broader look at what transpired on the day of the attack. Even when Rexroat and Echols started jawing with each other earlier in the dayroom, Officers Wallace and Logan reasonably separated the two men by 15–20 feet and positioned themselves on either side of Rexroat. Officer Johnson then ordered both men to be handcuffed. Echols insists that Officer Wallace should have handcuffed Rexroat that instant and, at the very least, not allowed him to place personal items in his room before being walked to the disciplinary unit. Yet Officer Wallace had no reason to believe that Rexroat would capitalize on that permission by bounding across the dayroom and striking Echols in the face with a concealed object. See *Thomas*, 39 F.4th at 842 (framing the question as whether the officers acted "responsibly under the circumstances that confront[ed] them," not whether they anticipated "every potential danger facing [the] detainee" (internal quotation marks omitted)).

Remember, too, that Rexroat had not made a single physical threat toward Echols before the attack. Under these circumstances, neither Officer Wallace nor Officer Logan acted unreasonably in the moments leading up to the attack, including by allowing Rexroat to stand up from the dayroom table and walk toward his room with personal items before being escorted to the disciplinary unit.

Disagreeing with our reasoning, Echols makes much of one aspect of Officer Logan's action in the seconds before the attack. Urging us to examine the video in detail, Echols highlights that Officer Johnson took a small step back as Rexroat stood up from the dayroom table to return his personal items to his room. Echols sees that small step back as Officer Logan acting unreasonably by creating room for Rexroat to embark on the attack.

We cannot get there. Isolating that step in freeze frame fashion overdramatizes Officer Logan's natural response to having been approached by a detainee who had just received permission to walk in his very direction. As soon as Rexroat bee-lined in a different direction, Officers Logan and Wallace chased after him and tackled him to the ground. No matter how many times we watch the video, we leave with the same reaction—surprise at what happened. Or as the internal security investigator put the point, violence of this kind was "absolutely, very rare."

The trial transcript confirms our impressions of the video footage. Echols did not present any evidence to suggest that Officers Johnson, Logan, and Wallace should have been on notice of an imminent violent altercation between Rexroat and Echols. The officers were not informed of the previous day's incident report describing the "tension" between the

two detainees. See *Kemp*, 27 F.4th at 497 (affirming summary judgment in part because "Kemp admitted that he never reported his verbal disagreement with [the other detainees] or the ensuing threats to jail employees, and that prior to the beating, all four men had cohabited peacefully for months").

Even if the officers had been made aware during their brief conversation with Rexroat on September 17 that he was unhappy about getting a roommate, the officers would have had no reason to suspect that Rexroat would become violent. Officers Wallace and Johnson testified that they knew Rexroat could be "outlandish" and "outspoken," and Officer Logan testified that he had known Rexroat to be "stubborn" but never "violent." Officer Brown testified at trial that it was "pretty typical" for a move to result in an "awkward mess" because "[t]here's a lot of people who do not want to be moved." This was a garden-variety situation at Rushville and one that rarely devolved into physical fights.

In the final analysis, we are unable to conclude that a reasonable officer in Johnson's, Wallace's, or Logan's position would have perceived the risk of serious harm that Rexroat posed to Echols. Nor does the evidence suggest that reasonable officers would have taken different measures to protect Echols. Rexroat's exceptionally sly attack on Echols cannot fairly be attributed to a violation of the Fourteenth Amendment. All of this leads us to AFFIRM.

JACKSON-AKIWUMI, *Circuit Judge,* dissenting. I agree with my colleagues that the district court erred by instructing the jury to consider the officers' subjective state of mind. But, unlike my colleagues, I believe the error prejudiced Echols at trial, so a new trial is warranted.

Echols must receive a new trial unless "the erroneous instruction likely made no difference in the outcome." *Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012). Although it is a close question, given the facts of this case, I cannot say the improper instruction made no difference. Echols presented sufficient evidence for a reasonable jury to find, in accord with the applicable law, that Officers Johnson, Logan, and Wallace were "on notice of a substantial risk" to Echols's safety and did not take "reasonable available measures to abate the risk." *Thomas v. Dart*, 39 F.4th 835, 841–42 (7th Cir. 2022) (internal quotation omitted)

Consider the following evidence. When the officers arrived, Echols and Rexroat were clearly at odds, so much so that Wallace ordered the other detainees to leave the dayroom for safety reasons. Rexroat was "disobeying orders" and acting "agitated." Johnson, in fact, had to call her supervisor for help, and the supervisor ordered her to take Echols and Rexroat to the disciplinary unit. Logan had Echols and Rexroat stay a room's length apart from each other, and Johnson felt the need to handcuff Echols. But no one cuffed Rexroat or otherwise restrained his movements. The officers left Rexroat free to move about the room, which gave Rexroat the opportunity to attack Echols. Echols's victory before a properly instructed jury is by no means assured. But all of these facts taken together are enough for a jury to conclude that a reasonable officer in Johnson's, Logan's, and Wallace's

shoes "would have appreciated the risk that [their] actions entailed," and that the officers' conduct was "objectively [un]reasonable." *See Kemp v. Fulton County*, 27 F.4th 491, 497 (7th Cir. 2022). The jury should have the opportunity to answer the question.

The majority is persuaded that the attack's timing and method "seemed most unpredictable," and concludes that the officers had no reason to believe that Rexroat would strike Echols "in the face with a concealed object." *Ante*, at 11. But that takes too narrow a view of the situation. Rexroat could have harmed Echols without a concealed object. The record shows that Rexroat was over 200 pounds—much larger than Echols—and could have used his fists or his bodyweight. On these facts, in addition to the ones above, a jury could find that reasonable officers should have anticipated some kind of attack and taken different protective measures. Because I believe Echols deserves the opportunity to present these facts to a properly instructed jury, I respectfully dissent.