In the

# United States Court of Appeals
## For the Seventh Circuit

───────────────

No. 23-2301

REGINALD PITTMAN, by and through his guardian and next friend, ROBIN M. HAMILTON,

*Plaintiff-Appellant*,

*v.*

MADISON COUNTY, ILLINOIS, *et al.*,

*Defendants-Appellee*s.

───────────────

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:08-cv-00890-DWD — **David W. Dugan**, *Judge*.

───────────────

ARGUED APRIL 2, 2024 — DECIDED JULY 16, 2024

───────────────

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Reginald Pittman, a pretrial detainee at the Madison County jail, attempted suicide while awaiting trial. He survived but suffered a severe brain injury. Complaining that two guards ignored his requests to see crisis counseling before the suicide attempt, Pittman sued Madison County and various jail officials under 42 U.S.C. § 1983, alleging that they violated the Fourteenth Amendment by

failing to provide him with adequate medical care. What followed is a lengthy procedural history including three appeals and three trials. On appeal from the third trial and verdict for the defendants, Pittman challenges a key jury instruction for his Fourteenth Amendment claim. He contends that the instruction erroneously required proof that the officers were subjectively aware or strongly suspected a high likelihood of self-harm.

Pittman pressed this argument in a prior appeal, and we rejected it. But much has evolved in our case law since that decision, as numerous cases have required us to grapple with the nuances of the state-of-mind requirements in claims brought by pretrial detainees. Aided by those decisions, we agree with Pittman that the jury instruction contained an error. Pittman did not need to prove subjective awareness of the risk of harm to establish liability. Instead, the jury should have been instructed to answer whether the defendants made an intentional decision with respect to Pittman's conditions of confinement, and from there, whether defendants acted objectively unreasonably by failing to mitigate the risk Pittman posed to himself.

In the end, though, we cannot conclude that the jury instruction error prejudiced Pittman. We reach that conclusion based on a thorough examination of the evidence presented at trial and the arguments of the parties. So we affirm.

# I

## A

The trial record following our most recent remand supplies the operative facts.

In August 2007, Reginald Pittman entered the Madison County jail as a pretrial detainee. Within a few months, he reported mental distress. In late October, he told a jail officer, Deputy Matthew Werner, that he was suicidal. Deputy Werner referred Pittman to a social worker from Chestnut Health Systems, also known as "crisis" counseling, and placed him on suicide watch for several days. A few weeks later, Pittman requested to see crisis counseling once again. At a counselor's suggestion, Sergeant Randy Eaton temporarily relocated Pittman to the Special Housing Unit for additional observation.

On December 19, Pittman attempted suicide. He hung himself from the bars of his cell with a bed sheet, resulting in a severe brain injury. Pittman left a suicide note stating that "the [g]uards" were "f***ing with [him]" and would not let him talk to "crisis [counseling]."

According to Bradley Banovz, an inmate housed near Pittman's cell, Pittman had asked Deputy Werner and Sergeant Eaton to refer him to crisis counseling in the days leading up to his suicide attempt, but neither did. Banovz testified that Pittman asked Deputy Werner to put him on the list for crisis counseling on Friday, December 14. As Banovz remembered, Deputy Werner did not take the request seriously, joking that Pittman did not need counseling. Deputy Werner reportedly told Pittman that he would be back on Monday and schedule him for crisis counseling then. That never happened.

Banovz also recalled that Pittman asked Sergeant Eaton to refer him to crisis counseling a few days later, on Tuesday, December 18. As Sergeant Eaton made his rounds that night, Banovz overheard Pittman—who was crying—ask to see crisis counseling with Eaton responding that he would schedule

an appointment. But Sergeant Eaton did not refer Pittman to crisis counseling either.

Deputy Werner and Sergeant Eaton both testified and offered an altogether different account. To be sure, they were quick to admit knowing that Pittman had been on suicide watch in October 2007. But they rejected Banovz's account and denied ever hearing or seeing any indication of subsequent mental distress from Pittman or, more specifically, ever hearing him ask to return to crisis counseling. And, going further, Deputy Werner and Sergeant Eaton insisted that had Pittman asked for crisis counseling, they would have referred him for mental health treatment.

B

Through his guardian, Pittman sued Madison County, Deputy Werner, Sergeant Eaton, and others, bringing claims under 42 U.S.C. § 1983 and state law. Pittman's § 1983 claim alleges that defendants violated the Due Process Clause of the Fourteenth Amendment by failing to respond to his requests for mental health treatment.

Pittman's case has a lengthy history, including three prior appeals. See *Pittman ex rel. Hamilton v. County of Madison* (*Pittman I*), 746 F.3d 766 (7th Cir. 2014) (reversing in part a grant of summary judgment for defendants because a triable issue of fact existed on Pittman's claims against Deputy Werner and Sergeant Eaton); *Pittman ex rel. Hamilton v. County of Madison* (*Pittman II*), 863 F.3d 734 (7th Cir. 2017) (reversing and remanding for a new trial because the district court erroneously excluded Banovz's recorded interview at the first trial); *Pittman ex rel. Hamilton v. County of Madison* (*Pittman III*), 970 F.3d 823 (7th Cir. 2020). Most relevant to this appeal

is *Pittman III*, which involved a pivotal jury instruction articulating the elements of Pittman's Fourteenth Amendment claim. In *Pittman III*, we held that a portion of that jury instruction misstated the law and remanded for a new trial.

The case then went to trial for the third time. Over Pittman's objection, the district court instructed the jury in line with our ruling in *Pittman III*, using materially identical language to that which we approved in *Pittman III*. The jury returned a verdict for defendants, and this appeal followed.

## II

The sole issue before us is whether the district court accurately instructed the jury on the elements of Pittman's Fourteenth Amendment claim. Pittman believes that the instruction improperly injected a subjective component into an otherwise objective inquiry, contravening *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), and our precedent.

"We evaluate [] jury instructions anew when deciding if they accurately state the law." *Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). If the instruction contains a legal error, we will reverse only if the error prejudiced Pittman. See *Cotts v. Osafo*, 692 F.3d 564, 567 (7th Cir. 2012).

## A

Incarcerated persons have a constitutional "right to receive adequate medical treatment," including mental health treatment and protection from self-harm. *Miranda*, 900 F.3d at 350 (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). But the source and scope of that right turns "on the relationship between the state and the person in the state's custody." *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017) (quoting *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013)).

For convicted prisoners, the Eighth Amendment's proscription on "cruel and unusual punishments" protects against deliberate indifference to serious medical needs. See *Estelle*, 429 U.S. at 102–04. These claims measure state-of-mind, specifically, deliberate indifference, using a subjective standard: to be liable a prison official must be "aware of a substantial risk of serious harm, and effectively condone[] the harm by allowing it to happen." *Jones v. Mathews*, 2 F.4th 607, 613 (7th Cir. 2021) (citation and internal quotation marks omitted). "This subjective standard," we have explained, "is closely linked to the language of the Eighth Amendment." *Miranda*, 900 F.3d at 350.

Pretrial detainees, however "stand in a different position: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence." *Id*. "[P]retrial detainees (unlike convicted prisoners) cannot be punished at all," *Kingsley*, 576 U.S. at 400, so "the [Eighth Amendment's] punishment model is inappropriate for them," *Miranda*, 900 F.3d at 350. Instead, they "are protected from certain abusive conditions" by the Fourteenth Amendment's Due Process Clause. *Id.*; see also *Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979) (explaining that "the restrictions and conditions of the detention facility" cannot "amount to punishment" because "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law").

These "different constitutional provisions" lead to "different standards." *Collins*, 851 F.3d at 731 (quoting *Currie*, 728 F.3d at 630). Yet for many years we "assessed pretrial detainees' medical care (and other) claims under the Eighth Amendment's [subjective] standards." *Miranda*, 900 F.3d at 350. That changed in *Kingsley*.

In *Kingsley*, the Supreme Court held that an objective reasonableness standard applies to a pretrial detainee's claim of excessive force. 576 U.S. at 392. Such a claim, the Court explained, involves "two separate state-of-mind" questions: (1) "the defendant's state of mind with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world," and (2) "the defendant's state of mind with respect to whether his use of force was 'excessive.'" *Id.* at 395. The former, which requires "a purposeful, a knowing, or possibly a reckless state of mind," was not disputed in *Kingsley* itself. *Id.* at 396. Still, the Court took care to observe that this part of the mental-state requirement safeguards against liability for "*negligently* inflicted harm," which is "categorically beneath the threshold of constitutional due process." *Id.* (citation and internal quotation marks omitted).

The Supreme Court focused its attention on the latter state-of-mind question, considering at some length whether "the defendant's state of mind with respect to the proper *interpretation* of the force" is judged by an objective or subjective standard. *Id.* That question, the Court determined, requires proof "only that the force purposely or knowingly used against [the pretrial detainee] was objectively unreasonable." *Id.* at 396–97. Applying this standard, the Court in *Kingsley* rejected jury instructions that suggested "weigh[ing] [a defendant's] subjective reasons for using force and subjective views about the excessiveness of the force." *Id.* at 403–04.

Concluding that the Supreme Court did not limit its reasoning in *Kingsley* to excessive force claims, we extended the objective reasonableness standard to pretrial detainees' medical care claims in our decision in *Miranda v. County of Lake*.

See 900 F.3d at 352. In doing so, we emphasized *Kingsley*'s reminder to pay careful attention to the different status of pretrial detainees. See *id.* at 352 (reiterating that "[t]he language of the two Clauses differs, and the nature of the claims often differs[, a]nd most importantly, pretrial detainees … cannot be punished at all, much less maliciously and sadistically" (citation and internal quotation marks omitted)). Conceptualizing the *Kingsley* standard, we concluded that a jury must decide two questions: (1) "whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case" and (2) whether the defendants' actions were "objectively reasonable." *Id.* at 353–54.

B

*Pittman III* came not long after *Miranda* and confronted how to instruct a jury on *Kingsley*'s objective standard. 970 F.3d at 827–28. During his second trial, which was reviewed on appeal in *Pittman III*, the district court instructed the jury that Pittman had to prove four elements to prevail on his Fourteenth Amendment claim against Deputy Werner and Sergeant Eaton for failing to respond to his requests for mental health care:

> (1) there was a strong likelihood that Pittman would seriously harm himself,
>
> (2) the defendants were aware of … or strongly suspected facts showing this strong likelihood,
>
> (3) they consciously failed to take reasonable measures to prevent Pittman from harming himself, and

> (4) Pittman would have suffered less harm if the defendants had not disregarded the risk.

*Id.* at 827 (cleaned up).

On appeal Pittman contended that the second and third elements of this instruction were inconsistent with *Kingsley* and *Miranda* because the "language directed the jury to apply the now-defunct subjective test rather than the [governing] objective test." *Id.*

We agreed that the instruction's use of the word "consciously" in the third element introduced a subjective component into the requirements for proving mental state. See *id.* at 828–29. But we rejected Pittman's argument that the instruction's second element, requiring proof that defendants "were aware of … or strongly suspected facts showing" a "strong likelihood" of harm, ran afoul of the guidance supplied by our post-*Kingsley* decision in *Miranda*. *Id.* at 827–28. That element, we concluded, was "consistent with *Miranda*" because it went "to *Miranda*'s first inquiry: whether the defendants acted purposefully, knowingly, or perhaps even recklessly." *Id.* at 827 (internal quotation marks omitted).

We reasoned that "if the defendants 'were aware' that their actions would be harmful, then they acted 'purposefully' or 'knowingly'; if they were not necessarily 'aware' but nevertheless 'strongly suspected' that their actions would lead to harmful results, then they acted 'recklessly.'" *Id.* at 828. In other words, to act purposefully, knowingly, or recklessly, a defendant must have personal knowledge of—and thereby subjectively appreciate—the consequences of their actions.

C

Since *Pittman III*, we have had additional occasions to consider *Kingsley*'s two-stepped mental state requirement applicable to claims brought by pretrial detainees. As we extended *Kingsley* to the failure-to-protect context, we determined that a pretrial detainee does not have to show a defendant's subjective awareness of the risk of harm. See *Kemp v. Fulton County*, 27 F.4th 491, 497 (7th Cir. 2022); *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022); *Echols v. Johnson*, No. 22-3230, 2024 WL 3197540, at *1 (7th Cir. June 27, 2024).

First, in *Kemp v. Fulton County*, we held that *Kingsley* abrogated our pre-*Kingsley* case law "to the extent that [it] require[d] pretrial detainees to show, in a failure-to-protect case, that a defendant was subjectively aware of a substantial risk of serious injury." 27 F.4th at 497 (internal quotation marks omitted). Such a requirement "cannot be reconciled with *Kingsley*'s language, reasoning, and reminder to 'pay careful attention to the different status of pretrial detainees.'" *Id.* (quoting *Miranda*, 900 F.3d at 352). Instead, a pretrial detainee must show that the defendant "intend[ed] to carry out a certain course of actions," and "[a]t that point, the remaining question is whether that course is objectively reasonable." *Id.*

We adhered to the same approach in *Thomas v. Dart*, articulating the elements of a Fourteenth Amendment failure-to-protect claim without reference to a defendant's subjective awareness of the risk of harm:

> (1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff

at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries.

39 F.4th at 841. As in *Kemp*, we still considered awareness of the risk of harm, but from the perspective of a reasonable officer as part of *Kingsley*'s objective reasonableness inquiry. See also *Echols*, 2024 WL 3197540, at *3–4 (applying the *Kingsley* standard in a recent failure-to-protect case and concluding that the jury instructions improperly required the plaintiff to prove subjective awareness of the risk of harm).

D

We have canvassed these post-*Kingsley* decisions in order to reveal the tension, if not inconsistency, in our case law. *Miranda* and *Pittman III* can be read as requiring pretrial detainees alleging inadequate medical care claims to prove defendants' subjective awareness of the risk of harm. See *Miranda*, 900 F.3d at 353–54; *Pittman III*, 970 F.3d at 827–28. Yet in *Kemp* and *Thomas* we retreated from any such requirement in evaluating the requirements for failure-to-protect claims. See *Kemp*, 27 F.4th at 497; *Thomas*, 39 F.4th at 841.

The confusion and discrepancy arise from our interpretation of *Kingsley*'s first state-of-mind inquiry: "the defendant's state of mind with respect to his physical acts." *Kingsley*, 576 U.S. at 395. *Pittman III*, and to a lesser extent *Miranda*,

conceptualize this inquiry as requiring proof of both intentional physical action *and* awareness of the consequences of that action. *Pittman III*, 970 F.3d at 827–28; *Miranda*, 900 F.3d at 353 (asking "whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly *when they considered the consequences*" of their actions (emphasis added)). Under this interpretation, a defendant must subjectively know the consequences of their action or inaction to act purposefully, knowingly, or recklessly.

On the other hand, our failure-to-protect cases perceive the first inquiry as a lower bar, requiring proof only that a defendant "intended to carry out a certain course of actions." See, *e.g.*, *Kemp*, 27 F.4th at 497. In these cases, once a defendant deliberately acts, their awareness of the risk of harm, or lack thereof, goes only to objective reasonableness. See *id.* at 496–97.

We owe it to our case law and litigants alike to resolve this confusion. Given the volume and importance of § 1983 pretrial detainee litigation, now is the time to resolve any inconsistency within our case law. The circumstance before us is one of our own making, as we (like many other courts) have struggled to implement *Kingsley*'s standards outside the context of a pretrial detainee's claim of excessive force. In light of today's clarification of our case law, we circulated this opinion to the full court under Circuit Rule 40(e). No judge in active service requested to hear this case *en banc*.

### III

### A

As difficult as it is to acknowledge, we have a hard time squaring *Pittman III* with our post-*Pittman III* precedent

interpreting and applying *Kingsley*. With the benefit of multiple cases in multiple contexts requiring application of this Circuit's and our sister circuits' analyses of *Kingsley*, we are left with the firm conviction that a pretrial detainee in a medical care case need not prove a defendant's subjective awareness of the risk of harm to prevail on a Fourteenth Amendment Due Process claim. To the extent *Pittman III* concluded otherwise, it is overruled on this particular point.

The Supreme Court in *Kingsley* described the first inquiry as focusing on a defendant's "state of mind with respect to the bringing about of *certain physical consequences* into the world." *Kingsley*, 576 U.S. at 395 (emphasis added). In articulating the content of this first inquiry in the excessive-force context, the Court distinguished between intentional acts—"the swing of a fist that hits a face, a push that leads to a fall, or the shot of a Taser that leads to the stunning of its recipient"—that can lead to liability, and negligent acts—"if an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee"—that cannot. *Id.* at 395–96. This framing asks strictly whether the defendant intended to commit the physical act that caused the alleged injury.

Only at the next step—as part of the second state-of-mind inquiry—do we begin to "interpret" the "reasonableness" of the defendant's action. *Id.* at 396. In the excessive-force context, "objective" factors informing this determination include "the relationship between the need for the use of force and the amount of force used" and "the threat reasonably perceived by the officer." *Id.* at 397. "*Subjective* reasons for using force," by contrast, and "*subjective* views about the excessiveness of the force," are off-limits. *Id.* at 403–04 (emphasis added). The objective reasonableness of a decision to deny medical care

likewise does not consider the defendant's *subjective* views about risk of harm and necessity of treatment. Instead, the proper inquiry turns on whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care.

This application of *Kingsley* comports with the Supreme Court's reminder that pretrial detainees stand in a different position than convicted prisoners. Convicted prisoners serving a sentence must produce subjective evidence that a defendant was "aware … that a substantial risk of serious harm exists" and "disregard[ed]" that risk to prevail. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); see also *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (requiring a "dual showing" that the defendant "(1) subjectively knew the prisoner was at a substantial risk of committing suicide and (2) intentionally disregarded that risk"). But "a pretrial detainee can prevail by providing *only* objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398 (emphasis added); see also *Bell*, 441 U.S. at 561. Accordingly, neither portion of the Eighth Amendment's subjective dual showing is required to establish Fourteenth Amendment liability.

In *Pittman III*, we expanded *Kingsley*'s first inquiry and risked collapsing this distinction. Instead of asking solely about a defendant's state-of-mind as to "the bringing about" of certain physical conditions, *Kingsley*, 576 U.S. at 398, we asked about their state-of-mind as to the risks that action or inaction posed. *Pittman III*, 970 F.3d at 828. This error likely originated with our observation in *Miranda* that *Kingsley* asks whether a defendant "acted purposefully, knowingly, or

perhaps even recklessly when they considered the consequences of their handling of [a plaintiff's] case." *Miranda*, 900 F.3d at 353–54 (stating that a properly instructed jury could find the defendant failed to act "with purposeful, knowing, or reckless disregard of the consequences"); *Pittman III*, 970 F.3d at 827–28 (interpreting *Miranda*). But in charting this course, the mistake we made was in reintroducing what *Kingsley* prohibited: consideration of a defendant's "intent (or motive) to punish." *Kingsley*, 576 U.S. at 398.

While recognizing our error, we acknowledge the difficulty we faced in *Pittman III*. This is a very complicated area of law, and in no way are we alone in struggling to discern the appropriate mental state standard for judging pretrial detainees' claims. See, *e.g.*, *Helphenstine v. Lewis County*, 60 F.4th 305, 315–17 (6th Cir. 2023) (collecting cases). The Supreme Court in *Kingsley* focused on a narrow question: whether, in the excessive force context, an objective or subjective standard applied to a defendant's state of mind regarding the interpretation of the force. See *Kingsley*, 576 U.S. at 395. As a result, the Court understandably left unresolved the several issues that the *Pittman III* panel faced, including the contours of the first *Kingsley* inquiry, how the two state-of-mind requirements interact, and how the *Kingsley* standard works in different contexts such as cases of inaction.

At the time of *Pittman III*, few courts had weighed in on these issues. But that has changed. Several of our fellow circuits now agree that a pretrial detainee does not have to prove a defendant's subjective awareness of a serious risk of harm. See *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (holding in the failure-to-protect context that "[u]nder *Kingsley*, a pretrial detainee need not prove those

subjective elements about the officer's actual awareness of the level of risk"); *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (extending *Castro*'s reasoning to medical-care claims by pretrial detainees); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (concluding that "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm" in a conditions of confinement case); *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023) (determining, in the medical care context, that "[t]he plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm"); *Lawler ex rel. Lawler v. Hardeman*, 93 F.4th 919, 927 (6th Cir. 2024) (explaining that "officers can face liability even if they did not actually know of a risk of harm to a pretrial detainee" if there is proof "that the officers recklessly disregarded a risk so obvious that they either knew or should have known of it" in a medical care case). We know of no circuit court that has reached a contrary conclusion.

And our post-*Pittman III* failure-to-protect cases have explained the *Kingsley* standard in cases of inaction. Leaning on *Kingsley*, we have concluded that *Kingsley*'s first inquiry requires proof only that a defendant made an intentional decision about the plaintiff's conditions. See *Kemp*, 27 F.4th at 496–97. For example, in *Kemp*, it was enough to show that the defendant "intentionally chose not to wear his hearing aid on the day of the fight," even if he did not appreciate the risk of harm from that choice. *Id.* at 497.

With the benefit of these developments, we recognize our error in *Pittman III*. By requiring proof that "the defendants were aware of … or strongly suspected facts showing" a strong likelihood of harm, *Pittman III*, 970 F.3d at 827, we introduced a subjective component into *Kingsley*'s otherwise objective inquiry. The district court, following our guidance in *Pittman III*, thus erred (through no fault of its own) by instructing the jury in this most recent trial that Pittman must prove that the defendants "were aware … or strongly suspected facts showing a strong likelihood that [Pittman] would be seriously harmed."

Instead, on the mental-state element in question, the district court should have instructed the jury that, to prevail, Pittman must prove that the defendants did not take reasonable available measures to abate the risk of serious harm to Pittman, even though *reasonable officers under the circumstances would have understood the high degree of risk involved*, making the consequences of the defendants' conduct obvious. That is the essential objective inquiry.

B

We have no doubt our course of action will catch the defendants by surprise. As they see it, we already approved the challenged language as consistent with *Kingsley* in *Pittman III*, creating law of the case that precludes further consideration. Tempting though it is, we cannot accept their invitation.

"The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Cannon v. Armstrong Containers, Inc.*, 92 F.4th 688, 701 (7th Cir. 2024) (quoting *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995)); *Pepper v. United*

*States*, 562 U.S. 476, 506 (2011) (defining the doctrine to "posit[] that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983))). It prevents a party from getting a "second bite at the [] apple." *Grede v. FCStone, LLC*, 867 F.3d 767, 775 (7th Cir. 2017). But "[t]he doctrine is discretionary, 'not an inflexible dictate.'" *Cannon*, 92 F.4th at 701 (quoting *Chi. Joe's Tea Room, LLC v. Village of Broadview*, 894 F.3d 807, 818 (7th Cir. 2018)); *Evans v. City of Chicago*, 873 F.2d 1007, 1014 (7th Cir. 1989) (describing the doctrine as "a self-imposed prudential limitation rather than a recognition of a limitation on the courts' power" (citation omitted)); *Avitia*, 49 F.3d at 1227 ("But it is no more than a presumption, one whose strength varies with the circumstances; it is not a straitjacket.").

Typically, courts will only depart from an earlier decision because of "good reason" or "unusual circumstances." *Cannon*, 92 F.4th at 701 (internal quotation marks omitted). That might include "(1) substantial new evidence introduced after the first review, (2) an intervening change in the law, and (3) a clearly erroneous decision." *Id.* But the "duty of adherence is less rigid" "if the ruling in question was by the same court." *Avitia*, 49 F.3d at 1227. In those circumstances, "[t]he doctrine does not apply if the court is 'convinced that [its prior decision] is clearly erroneous and would work a manifest injustice.'" *Agostini v. Felton*, 521 U.S. 203, 236 (1997) (quoting *Arizona*, 460 U.S. at 618 n.8).

Because we conclude *Pittman III* would be decided differently given our current understanding of *Kingsley*, adherence to that decision risks a manifest injustice and the law of the case doctrine does not apply.

**IV**

Pittman's task on appeal is not yet over. We must still assess whether the jury instruction error prejudiced him. *Cotts*, 692 F.3d at 567. "When evaluating prejudice, we view the evidence as a whole to determine whether the jury could have reached a different outcome had the instructions been correct." *Kuberski v. Rev Recreation Grp.*, 5 F.4th 775, 780 (7th Cir. 2021). On this trial record—and especially mindful of the evidence and arguments by both parties—we conclude that the erroneous instruction did not impact the jury's verdict.

At bottom, the parties presented this case as a credibility contest: which version of events—Bradley Banovz's or the officers'—was more believable? Pittman's counsel told the jury that Banovz was the "lynchpin" of the case, and defense counsel agreed. In framing the case (and the accompanying presentation of evidence) this way, neither Pittman nor the defendants focused on Deputy Werner's or Sergeant Eaton's *subjective* mental states about the risk of harm Pittman posed to himself. To the contrary, the parties pinpointed their focus on whether, in the weeks before his suicide attempt, Pittman ever asked Deputy Werner or Sergeant Eaton to return to crisis counseling.

Pittman urged the jury to believe Banovz's testimony that he asked Officers Werner and Eaton for crisis counseling and that the officers promised to make the referral. Banovz further testified that Sergeant Eaton heard Pittman crying in his cell— possibly for hours—the night he asked Eaton to see crisis counseling. It is undisputed that no referral was made—despite both officers' knowledge that Pittman had spent time on suicide watch about two months earlier. So, relying on multiple lay and expert witnesses, Pittman urged the jury to find

that a properly-trained correctional officer at the Madison County jail would have understood the need to follow through on an inmate's request for crisis counseling—especially after promising to make the referral.

Deputy Werner and Sergeant Eaton pressed an entirely different account. They testified that they had a positive relationship with Pittman—testimony that aligned with Banovz's statements that Pittman viewed both officers as his favorites within the Madison County jail. Werner and Eaton denied ever hearing Pittman ask to return to crisis counseling and testified that, had they ever heard such a request, they would have made the referral. Both went a step further and agreed that failing to respond to an inmate's request for crisis counseling would have been unreasonable.

The parties put the case to the jury in this exact way—as a binary choice on credibility: believe Bradley Banovz or believe the two officers. Given this presentation, we cannot see how the erroneous jury instruction had any impact on the jury's verdict for the defendants. Neither Pittman nor the defendants focused their arguments on Deputy Werner's and Sergeant Eaton's subjective awareness of what would likely happen to Pittman if they ignored his request for crisis counseling. The case went to the jury with both sides hinging everything on whether Pittman asked for crisis counseling at all.

Presented in that way, the correct instruction would not have changed the outcome. If the jury believed the defendants' testimony, a reasonable officer in their shoes would know only that Pittman had previously been on suicide watch a few weeks before his attempt. But many detainees spend time on suicide watch without later attempting suicide, so that alone would not put a reasonable officer on notice of a

substantial risk of harm or render defendants' failure to *sua sponte* refer Pittman to crisis counseling objectively unreasonable.

Conversely, if the jury believed Banovz's testimony, Deputy Werner and Sergeant Eaton admitted that ignoring an inmate's crisis counseling request would be unreasonable. As such, neither party presented a theory whereby a jury could believe that even though a reasonable officer would have appreciated the risk of harm, Deputy Werner and Sergeant Eaton subjectively did not. Because of the way the parties presented this case, we conclude that the erroneous jury instruction did not steer the jury toward a verdict that turned on defendants' subjective awareness of the risk of harm to Pittman.

## V

The broader circumstances and duration of this litigation are not lost on us. Pittman filed suit before *Kingsley* and in the years since, the legal landscape for assessing pretrial detainee claims has meaningfully changed. *Kingsley* set in motion that change and ever since, we have confronted nuanced legal issues presented by pretrial detainees' Fourteenth Amendment claims. While we hold that the district court erred when instructing the jury that a pretrial detainee must show a defendant was subjectively aware of the risk of harm, we do not fault the district court or parties for this error.

As the record reveals, the district court and parties handled this case and the jury instructions with care. The district court faithfully applied our guidance in *Pittman III* and ultimately, the legal mistake we recognize today did not prejudice Pittman.

In the final analysis, then, we AFFIRM.