In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2799

NICHOLAS ZEMLICK,

*Plaintiff-Appellant,*

*v.*

BRAD BURKHART, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-02319 — **Matthew P. Brookman,** *Judge.*

ARGUED SEPTEMBER 9, 2025 — DECIDED JANUARY 22, 2026

Before ST. EVE, LEE, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Nicholas Zemlick had an elective off-site abdominal surgery while he was detained at the Hancock County Jail in Indiana. While Zemlick recovered at the jail, he developed an infection and became miserably ill. Jail officials took Zemlick to the hospital for emergency surgery to treat the infection. He made a full recovery. Zemlick sued the Hancock County Sheriff (who runs the jail) and two Sheriff's office personnel (who staff the jail) under 42 U.S.C. § 1983. He

claimed the Sheriff's officers were deliberately indifferent to his medical needs in violation of his due process rights under the Fourteenth Amendment. He also brought a *Monell* claim, alleging that the Sheriff failed to ensure adequate resources at the jail. The district court granted summary judgment to the defendants, and Zemlick now appeals. Because his claims fail on the merits, are waived, or are barred by qualified immunity, we affirm.

## I. Background

In reviewing the district court's grant of summary judgment to the officers, we construe all facts and draw all justifiable inferences in the light most favorable to Zemlick. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In August 2020, Nicholas Zemlick was arrested and detained at the Hancock County Jail. At that time, Zemlick had a colostomy stoma,[1] put in place months earlier after a January 2020 motor vehicle accident. Shortly after his arrival, Zemlick and jail medical staff arranged for him to have an elective colostomy reversal surgery at an off-site location, paid for by the county. Defendant Sheriff Brian Burkhart—the elected county official responsible for operating the jail—approved that plan but had no further involvement in Zemlick's medical care. Before the procedure, an outside specialist informed Zemlick of the risks, which included post-operative abdominal infection. Zemlick went forward with the surgery on December 8, 2020, and he returned to the jail on December 13.

---

[1] *Colostomy*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/colostomy/about/pac-20583139 [https://perma.cc/93CQ-XD8R] (last visited Jan. 21, 2026) (describing the procedure).

Upon his return, the jail's medical staff took over Zemlick's post-operative care. Zemlick was housed in a single cell in the receiving area near the jail's medical staff. Zemlick's care plan included daily wound checks and the administration of several medications. Jail medical staff treated Zemlick on December 13, 14, and 15. After one of these visits, the on-call physician prescribed oxycodone for pain management. Jail records do not reflect any medical evaluation of Zemlick between December 15 and 21, but Zemlick testified that Nurse Brigett Holmes changed his wound dressing whenever she worked. Holmes worked nearly 90 hours between December 13 and 26, and she testified that she treated Zemlick each day she worked during that period. Jail records also show that Zemlick received wound care on December 14, 21, 25, and 26.

On December 21, Holmes reported to the on-call physician that Zemlick was experiencing dizzy spells and body aches. She observed that Zemlick's blood pressure had been elevated for a few days, there was drainage on his wound dressing, and his wound looked infected, but his temperature was not elevated. Zemlick recalled feeling so badly by this point that he "couldn't get out of bed." Zemlick was prescribed antibiotics and referred to his outside surgeon for a follow-up. The record does not show that Zemlick saw his surgeon based on that referral.

On December 25, Nurse Megan Ward examined Zemlick and grew concerned about the wound's appearance, noting redness and a "bubble" forming near the incision. Zemlick reported dizziness, chills, and "not feeling right," though his temperature still was not elevated. The on-call physician prescribed a different antibiotic and directed that medical staff take a culture of Zemlick's wound.

Meanwhile, Zemlick had been complaining to defendant Sheriff's Lieutenant Matthew Boots about the quality of the medical care he was receiving. Boots served as the assistant jail commander, and his office was near Zemlick's cell. Zemlick testified he "talked to Mr. Boots about everything that happened as it happened," and that he saw Boots every day Boots was working: December 14 through 18, 22, and 23. Boots does not recall these discussions but testified that he likely told Zemlick to address his complaints to the medical staff. Boots was not particularly alarmed by Zemlick's complaints, as he testified: "Every [detainee] I ever ran across was complaining to me about something due to my position in the jail." Boots also testified that "if medical is doing what they're supposed to do, I probably told him something along the line of, yeah, medical is doing the best they can, we're doing the best we can."

On December 26, Zemlick was experiencing intense pain and heavy drainage from his abdomen. To address the excessive drainage, Holmes changed Zemlick's dressing several times that day. Either that day or early on December 27, Zemlick heard Holmes tell defendant Sheriff's Corporal Luke Schmidt, who was the overnight shift commander: "you have to get him out of here, he's going to die." Before the end of their shifts at 6 a.m. on December 27, Holmes also told Schmidt that Zemlick needed to go to the hospital, but that he did not need to go by ambulance. Holmes did not assess Zemlick's condition to be imminently life-threatening, and she did not believe he needed to be transported to the hospital immediately by ambulance. When a jail detainee does not require an ambulance, an officer transports him to the hospital in a county vehicle. Schmidt wanted to wait until the 6 a.m. shift

change for another officer to transport Zemlick, delaying Zemlick's transport by about two hours.

On December 27 at 6:01 a.m., Zemlick departed the jail by officer transport. He arrived at the hospital at 6:30 and was first evaluated in the emergency room shortly after 7 a.m. Zemlick then had emergency surgery to drain his abdominal infection, and he returned to the jail on December 29.

After returning to the jail, Zemlick's bandages were supposed to be changed twice daily. But Zemlick contends that medical staff did not adhere to that regimen, and he submitted grievances about this issue and complained directly to Boots. During that time, Zemlick's medical records show that his wound was healing as expected. There is no evidence that Zemlick had any complications or infections after the December 27 surgery.

Zemlick sued the three Sheriff's office defendants, the third-party entity that employs medical personnel at the jail, and 16 doctors and nurses comprising the jail's medical staff. He alleged that all were negligent and deliberately indifferent to his medical needs under the Fourteenth Amendment, among other claims. The district court granted summary judgment to all defendants on Zemlick's federal claims and relinquished supplemental jurisdiction over the state-law claims. Zemlick appealed. He then settled with the medical staff defendants, leaving only his claims against Burkhart, Boots, and Schmidt.

## II. Discussion

We review the district court's order granting summary judgment *de novo*. *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020). Summary judgment is appropriate when "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe the facts and draw all justifiable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255. We do not weigh evidence or make credibility determinations—those tasks are entrusted to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

We set forth the governing legal standards and review each of Zemlick's individual-capacity claims against each defendant before assessing his *Monell* claim against the Sheriff.

## A. Zemlick's Claim for Deliberate Indifference to Medical Needs

Zemlick contends that Burkhart, Boots, and Schmidt were deliberately indifferent to his medical needs in violation of the Fourteenth Amendment's Due Process Clause. We discuss the governing legal framework applicable to such claims before applying it to each defendant.

We assess pre-trial conditions of confinement under the Fourteenth Amendment's Due Process Clause. *Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). To prevail on his claim for deliberate indifference to medical needs, Zemlick must establish, in addition to causation and harm, that:

> the defendants did not take reasonable available measures to abate the risk of serious harm to [Zemlick], even though *reasonable officers under the circumstances would have understood the high degree of risk involved*, making the consequences of the defendants' conduct obvious.

*Pittman v. Madison County*, 108 F.4th 561, 572 (7th Cir. 2024) ("*Pittman IV*"). We analyze such claims objectively—a

plaintiff "d[oes] not need to prove subjective awareness of the risk of harm." *Id.* at 564. Instead, we ask "whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care." *Id.* at 570.

Further, to subject defendants to liability, Zemlick must also overcome qualified immunity. "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks omitted). That means "government officials performing discretionary functions"—like jail officials managing pre-trial detainees—are immune from civil liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Such officials receive qualified immunity unless: "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (internal quotation marks omitted). In this context, to defeat qualified immunity Zemlick must show that "every reasonable officer must have understood that deferring to the judgment of medical staff in these circumstances was unlawful." *McGee v. Parsano*, 55 F.4th 563, 572 (7th Cir. 2022).

With these standards in mind, we assess whether summary judgment was appropriate, based on either the merits or qualified immunity, on Zemlick's deliberate indifference claims against each of the three defendants in this appeal—Burkhart, Boots, and Schmidt. We consider each defendant's

liability under section 1983 independently. *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023).

### 1. Sheriff Brian Burkhart

Zemlick contends that Burkhart "abdicated his … role to ensure" that the jail provided adequate medical services and that "Burkhart's failure to ensure that his jail staff were properly trained to ensure access to adequate medical care led to the violation of Mr. Zemlick's due process rights." To face section 1983 liability, a defendant must be personally (not vicariously) responsible for the deprivation of the plaintiff's constitutional right. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Accordingly, to the extent he maintains this claim on appeal, Zemlick's individual-capacity claim against Burkhart requires evidence Burkhart personally violated Zemlick's federal rights. *Id.* But the record contains no such evidence with respect to Burkhart. Indeed, Burkhart played no direct role in Zemlick's ordeal other than approving Hancock County's payment for Zemlick's initial colostomy takedown procedure.

The personal-involvement requirement may be fulfilled for supervisory officers like Burkhart through indirect conduct. *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). But "supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not" directly liable because mere negligence is not enough. *Id.* Rather, the "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* And our precedent also makes clear that Burkhart—a nonmedical jail officer—is generally entitled to defer to medical providers absent evidence of deficient care. *Miranda*, 900 F.3d at 343. Zemlick offers nothing to undermine

Burkhart's reliance on the jail's medical staff. Put differently, Zemlick offers no evidence that Burkhart relied on medical staff negligently—let alone unreasonably—in violation of the Fourteenth Amendment's Due Process Clause. We therefore agree with the district court that Burkhart is entitled to summary judgment.

### 2. Sheriff's Lieutenant Matthew Boots

Zemlick argues that Boots was deliberately indifferent to his medical needs in ignoring Zemlick's complaints in blind reliance on the jail's medical staff. But Zemlick may succeed on this claim only if Boots is not entitled to qualified immunity. The Supreme Court has instructed "that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *Wesby*, 583 U.S. at 62 n.7 (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)).

With that admonition, we begin with step two of the qualified-immunity analysis: whether Boots's conduct was clearly established to be unlawful at the time Zemlick complained to Boots about his medical care. We assess whether, "at the time of the challenged conduct," precedent "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). For Zemlick to overcome this considerable hurdle, every reasonable jail officer must have understood that Boots was violating Zemlick's rights by declining to take any action and deferring to the jail medical staff in response to Zemlick's complaints about his ongoing care. *Id.*

Here, the case law existing as of December 2020 shows that Boots's conduct did not violate clearly established law. On the contrary, Boots's conduct is consistent with conduct we have

held is *not* unlawful in similar contexts. No clearly established law compelled Boots to follow up on Zemlick's complaints about his care when Zemlick was already being closely monitored by the medical staff.

To start, nonmedical jail staff are permitted to rely on the professional judgment of medical staff. For example, in *Johnson v. Doughty*, we held that "non-medical prison official[s]… cannot be held deliberately indifferent simply because [they] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." 433 F.3d 1001, 1012 (7th Cir. 2006) (internal quotation marks omitted).[2]

Boots was entitled to defer to the judgment of medical personnel "without fear of liability for doing so." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). That is because correctional facilities "engage in the division of labor" between medical professionals and other administrative and security officers. *Miranda*, 900 F.3d at 343. We thus do not hold jail officers liable for reasonably relying on and "generally trust[ing] the professionals to provide appropriate medical attention." *Id.* "[A] non-medical prison official will generally be justified in believing that the prisoner is in capable hands" when treated by jail medical staff. *Greeno v. Daley*, 414 F.3d

---

[2] Post-conviction deliberate indifference claims are governed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 101 (1976). After *Johnson*, we clarified that while Eighth Amendment claims require inquiry into the officer's subjective state of mind, due process claims like Zemlick's turn only on the objective reasonableness of the officer's conduct. *Pittman IV*, 108 F.4th at 570. But that later clarification did not disturb *Johnson*'s holding that deference to medical staff does not amount to deliberate indifference.

645, 656 (7th Cir. 2005) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

That deference is not limitless: "nonmedical officers may be found deliberately indifferent if they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotation marks omitted). But because correctional staff "must discriminate between serious risks of harm and feigned or imagined ones, which is not an easy task," we do not require them to be "credulous" in response to detainees' complaints or to assess risks "flawlessly." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004).

Our 2022 decision in *McGee* post-dates Zemlick's ordeal, but summarized this principle from *King*:

> [C]orrections officers are not constitutionally obligated to override the judgment of medical professionals unless they have reason to know that an inmate is receiving inadequate treatment. This remains true even when an inmate is in obvious distress and even when the medical staff has misdiagnosed an inmate[.]

55 F.4th at 573. Indeed, because *King* was decided at the qualified-immunity inquiry's first step, it "affirmatively established that a corrections officer may trust jail medical professionals to provide inmates with appropriate medical care." *Id.* We have cited this principle to affirm summary judgment in favor of nonmedical jail officer cases that pre-date Zemlick's ordeal, too. *E.g.*, *Miranda*, 900 F.3d at 343 (affirming summary judgment because, just before a detainee on a hunger strike

died of starvation, medical staff told jail officials that the detainee "was stable and promised to send her to the hospital if necessary"); *Estate of Perry v. Wentzel*, 872 F.3d 439, 458–59 (7th Cir. 2017) (holding nonmedical jail staff were entitled to rely on nurse's judgment even though they saw the inmate bleeding from his mouth and soiling himself before he died).

*Johnson*, *King*, *Rausch*, *Miranda*, *Greeno*, and *Perry* all suggest that Boots was entitled to defer to medical staff. Boots has no medical training that positioned him to independently assess Zemlick. Boots's conduct under the circumstances is consistent with our precedent upholding (and encouraging) jail officers' deference to medical staff.

Moreover, Boots had no reason to believe (or actual knowledge) that prison doctors or their assistants were mistreating (or not treating) Zemlick. Zemlick's complaints to Boots were too general to place Boots on notice of Zemlick's concern that the medical care he was receiving was constitutionally deficient. Boots knew that Zemlick was housed in the jail's medical area and receiving daily care during his recovery. And the record shows Zemlick received consistent treatment. "This is not a case where [Zemlick] was being completely ignored by medical staff." *Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011) (affirming dismissal of a complaint alleging deliberate indifference against a nonmedical officer who deferred to medical staff on treatment of prisoner's rheumatoid arthritis). That remained true while Zemlick's condition worsened, and he was prescribed different courses of antibiotics. In these circumstances, it was not clearly established that Boots would be violating Zemlick's rights by deferring to the medical personnel.

That said, we acknowledge the record permits the inference (which we must draw in Zemlick's favor) that Boots may have failed to relay any of Zemlick's complaints. That could amount to negligence. But negligence cannot support a due process violation, which demands a showing of deliberate indifference. *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012). *Johnson* illustrates the point: an inmate (Johnson) with a hernia complained to a nonmedical jail official (Jones) about his care by a prison doctor. 433 F.3d at 1011. Jones told Johnson he would follow up on his informal complaint but never did. *Id.* at 1012. We affirmed the grant of summary judgment to Jones, observing that "Jones's apparent failure to get back with Johnson about his informal complaint evinces a negligent handling of the complaint and not deliberate indifference." *Id.* We have explicitly held that "negligent conduct does not offend the Due Process Clause" in a case involving a detainee's claim for deliberate indifference to medical needs. *Miranda*, 900 F.3d at 353 (citing *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)). Proving deliberate indifference requires a plaintiff to clear a "high bar," and "even gross negligence" is insufficient. *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021).

In any event, Zemlick's case does not present a situation where every reasonable officer would know that Boots's conduct amounted to a violation of Zemlick's rights. For that reason, Zemlick cannot overcome Boots's qualified immunity.

Our analysis thus ends where it began, at step two of the qualified-immunity inquiry. *McGee*, 55 F.4th at 572. Because Boots's conduct was not clearly established as unlawful, he is entitled to qualified immunity, and we affirm the district court's grant of summary judgment to Boots.

   3.  *Sheriff's Corporal Luke Schmidt*

Zemlick posits that Schmidt was deliberately indifferent to Zemlick's medical needs in delaying his transport to the hospital to await a shift change. As above, we assess Zemlick's claim against Schmidt at the second step of the qualified-immunity analysis, and conclude Schmidt is entitled to qualified immunity.

For Schmidt to face liability, every reasonable jail officer must have understood that Schmidt was violating Zemlick's rights by failing to call an ambulance and awaiting a shift change, delaying Zemlick's transport to the hospital by two hours. *See al-Kidd*, 563 U.S. at 741.

We have observed that correctional facilities "have limited resources, and that fact makes some delay inevitable." *Mitchell v. Kallas*, 895 F.3d 492, 500 (7th Cir. 2018). But we have also held that "[a] delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). For example, in *Grieveson*, we reversed the grant of summary judgment to nonmedical jail officers where the officers knew that a detainee had suffered a broken nose and was in intense pain but waited nearly two days to secure any medical treatment for him. *Id.* at 779–80.

That said, we have also held that short delays between injury and treatment do not support deliberate indifference. In *Knight v. Wiseman*, an inmate injured his shoulder while doing off-site roadside maintenance and had to wait for a ride back to the facility from an officer, who took the inmate to the medical unit after stopping along the way to drop off items

elsewhere. 590 F.3d 458, 461–62 (7th Cir. 2009). About two and a half hours elapsed between the inmate's injury and treatment. *Id.* at 466. We nonetheless affirmed summary judgment for the officers and observed that "[a]n unincarcerated individual may well consider oneself fortunate if he receives medical attention at a standard emergency room within that short of a period of time." *Id.*

Of course, even short delays may be actionable where, for example, an officer "encountered an inmate in severe distress, sobbing in pain and complaining that he was unable to move, and did, literally, nothing." *Lewis v. McLean*, 864 F.3d 556, 564–65 (7th Cir. 2017) (reversing grant of summary judgment to an officer whose inaction contributed to an hour-and-a-half delay in treating the inmate's debilitating muscle spasm). But we held as much when the plaintiff was not already being cared for by the medical staff; instead, he was wholly reliant on the nonmedical officers to relay his emergency to medical personnel. *Id.* at 564.

None of these cases place the lawfulness of Schmidt's conduct "beyond debate" such that it was clearly established that delaying Zemlick's transport by two hours would violate his constitutional rights. Unlike the officers in *Grieveson* and *Lewis*, Schmidt knew that Zemlick was already in the care of the jail's medical staff who were fully informed of Zemlick's condition. This was not a situation where only Schmidt knew of Zemlick's plight and did nothing or failed to secure medical assistance. Like Boots, in these circumstances, Schmidt was entitled to defer to the judgment of medical staff. *See Miranda*, 900 F.3d at 343.

Recall that Nurse Holmes advised Schmidt that Zemlick did not require an ambulance and could wait until the shift

change to go to the hospital by officer transport. Though Zemlick points to her earlier statement that he would die if not transported, Holmes also later said that an ambulance was not necessary. Thus, in context, Holmes's first statement did not convey that she believed Zemlick would die imminently, just that he needed to go to the hospital. After all, Zemlick's condition was serious: he was on the verge of sepsis and required immediate surgery on his arrival at the hospital. Schmidt could have exercised his discretion to call an ambulance over Holmes's determination that Zemlick's situation was not emergent, but we cannot say that Zemlick had a clearly established right compelling Schmidt to do so.

In essence, Zemlick—in arguing to the contrary—advocates for a due process right to have a nonmedical jail officer veto the medical staff's judgment about a detainee's medical condition and to immediately take a detainee to the hospital at the detainee's request. But we are aware of no authority establishing such a right. Rather, in most situations, "the law *encourages* non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Berry*, 604 F.3d at 440 (emphasis added).

For these reasons, Schmidt is entitled to qualified immunity, and we affirm the district court's grant of summary judgment to Schmidt.

## B. Zemlick's *Monell* Claim

In addition to his individual-capacity claims, Zemlick brought an official-capacity claim against Sheriff Burkhart. Section 1983 does not allow vicarious-liability theories against

municipalities and higher-level decisionmakers like Burkhart. *Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009). Instead, such parties may be held accountable for constitutional violations they cause through their subordinate officers by official policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Zemlick alleged that Burkhart failed to ensure the Hancock County Jail had "appropriate resources, including staffing," to provide Zemlick medical care, because Burkhart made the "decision to prioritize money over the health of the prisoners in his charge[.]" Later in the proceedings, Zemlick's theory changed: Burkhart "fail[ed] to ensure that his jail staff were properly trained to ensure access to adequate medical care[.]" Regardless of the formulation, these two *Monell* theories fail both for procedural reasons and on the merits.

The district court granted summary judgment to Burkhart on Zemlick's *Monell* claim because Zemlick changed his *Monell* theory in his response brief opposing defendants' motion for summary judgment. Zemlick's statement of claims—required by the district court's case management order—does not contain his present *Monell* theory: that Burkhart "fail[ed] to ensure that his jail staff were properly trained to ensure access to adequate medical care[.]" That differs from the earlier theory (the county prioritized saving money over detainees' health) that Zemlick included in his pleadings and maintained throughout discovery. Given this difference, the district court found Zemlick's present *Monell* theory waived in enforcing its case management order that instructed: "the party with the burden of proof shall file a statement of the claims or defenses it intends to prove at trial, stating

specifically *the legal theories* upon which the claims or defenses are based."[3]

The Southern District of Indiana routinely holds that legal claims not specifically raised in a plaintiff's statement of claims are abandoned, forfeited, or waived. *Dysland v. Shelter Moving & Storage, Inc.*, 2022 WL 18540516, at *2 (S.D. Ind. Sept. 7, 2022) (collecting cases). Indeed, the district court's case management order warned that failure to include a claim or defense in the statement of claims "may result in the waiver of the omitted claim or defense." We have previously held that the district court does not abuse its discretion in enforcing that requirement. *Jackson v. Regions Bank*, 838 F. App'x 195, 198 (7th Cir. 2021); *see also Frakes v. Peoria School District No. 150*, 872 F.3d 545, 549 (7th Cir. 2017) (observing that pursuant to Rule 83, "a district court may adopt and amend local rules so long as they are consistent with, but not duplicative of, the Federal Rules").

Here, because "district courts may require strict compliance with their local rules[,]" it was not an abuse of discretion to reject Zemlick's new *Monell* theory under the district court's established procedures. *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020).

Further, Zemlick does not argue that the district court's statement-of-claims rule is inconsistent with the federal rules

---

[3] Zemlick did not need to specify a legal theory supporting his *Monell* claim in his complaint, as "we have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). Rather, the district court required Zemlick to articulate his legal theory in his statement of claims, which is within its discretion. *See Elizarri v. Sheriff of Cook County*, 901 F.3d 787, 790–91 (7th Cir. 2018).

or otherwise improper under Rule 83. And of course, since he replaced his original theory with the new one at summary judgment, Zemlick also failed to develop arguments supporting the original theory, resulting in waiver. *Keck Garrett & Assocs. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (holding that a nonmovant's failure to defend a claim in its opposition to the motion for summary judgment resulted in waiver).

Even were we to set these waivers aside, the claim remains a nonstarter. Zemlick developed no evidence at summary judgment to show the county had any policy, widespread practice, or custom that resulted in deficient training of jail officers or understaffing at the jail that led to his abdominal infection. *See Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) ("A governmental unit is not liable under § 1983 unless the deprivation of constitutional rights is caused by its own policy or custom."). Instead, the record reflects that jail officers were trained to notify medical staff if a detainee needs care, and to elevate repeated concerns to a supervisor. Jail officers likewise were trained to make hourly rounds, permitting them to observe detainees' physical condition. And the county affords detainees round-the-clock access to medical staff. The record lacks any evidence of budget cuts, understaffing, or shortfalls in the jail's training program constituting "deliberate conduct" that was the "moving force" behind a violation of Zemlick's federal rights. *Board of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (explaining plaintiff must show "the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"). Zemlick cannot overcome that considerable

hurdle, so either of his *Monell* claim formulations would also fail on the merits.

Therefore, Zemlick's *Monell* theory fails, and the district court properly granted summary judgment to Burkhart on Zemlick's official-capacity claim.

### III. Conclusion

For the reasons stated above, we AFFIRM the district court's judgment.